# EXHIBIT C



# FOIA REQUEST FOR ICE RECORDS CONCERNING REMOVAL OPERATIONS OF IRANIAN NATIONALS, INCLUDING LAYOVER TRANSFERS VIA QATAR

November 19, 2025

Electronic Submission Via https://www.securerelease.us
Email: ice-foia@ice.dhs.gov
U.S. Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street SW, Stop 5009
Washington, DC 20536-5009

**Re:** FOIA Request for ICE Records Related to Deportation of Iranian Nationals

Dear FOIA Officer:

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the implementing regulations of the Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE"), 6 C.F.R. Part 5, the Iranian American Legal Defense Fund ("IALDF") submits this request for records related to the 2025 removal of Iranian nationals, including removals conducted through third-country "Layover Transfers" such as Qatar. The request is specifically targeted at records detailing the operational, legal, and financial infrastructure and mechanisms used by U.S. Immigration and Customs Enforcement (ICE) for the removal of Iranian nationals, with particular emphasis on direct and non-direct removal routes involving third-country transfers.

IALDF is a nonprofit, non-commercial public-interest organization engaged in public legal advocacy, government oversight, and public education.

## I.    Timeframe and Scope of Search

This request seeks records generated, modified, or maintained from January 1, 2025 through the date of processing this request. The agency's search must be diligent and extend beyond a single centralized repository to include all components likely to hold responsive records concerning removal operations and their associated legal vetting, contracts, and logistics.

The search must include all responsive documents held by ICE including:

1.  **ICE Enforcement and Removal Operations (ERO) Headquarters:** Including ICE Air Operations, which manages all air transportation logistics, domestic transfers, and deportation flights.

2.  **ICE Office of the Principal Legal Advisor (OPLA):** Responsible for legal review, policy drafting, and managing appeals and diplomatic assurances related to removal.

3.  **ICE Office of Acquisition Management:** Responsible for managing and maintaining records of contracts, Memoranda of Understanding (MOU), and Task Orders related to detention and air transport services.

4.  **Relevant ERO Field Offices:** Specifically, those identified in recent enforcement actions or detention expansion efforts, including ERO Chicago, Harlingen, Newark, Salt Lake City, and Alexandria, LA (identified as an ICE hub for air operations). The agency must ensure that if a receiving DHS component may maintain records responsive to any portion of this request, that component is obligated to conduct a search.

## II.    <u>Definitions and Key Operational Terminology</u>

To ensure a precise and comprehensive search, the agency must utilize the following specific legal and operational definitions when identifying responsive records. The use of these specialized terms also mandates a search for documentation related to non-routine procedures and sensitive diplomatic maneuvers.

| Term | Precise Definition for Search Purposes |
|---|---|
| Iranian National | Any individual identified by ICE as a citizen or national of Iran (Islamic Republic of Iran), regardless of dual citizenship, who was processed for removal, deportation, expedited removal, or voluntary departure or return via air transportation during the specified timeframe. |
| Removal Operation | Any administrative or enforcement action categorized by ICE/ERO as removal, deportation, expedited removal, voluntary departure or return (including cases involving foreign government transfer), or exclusion carried out utilizing air transportation (ICE Air, commercial charter, U.S. or foreign government or military aircraft). |
| Layover Transfer | Any removal operation that utilizes a planned intermediate stop in a *third country* (neither the U.S. nor the final destination country of removal) where the custody of the Iranian National is transferred from U.S. officials (ICE ERO) to officials of the final destination country or to a third-party government or charter organization (e.g., a foreign airline) for immediate onward travel to Iran. This |

2

| Term | Precise Definition for Search Purposes |
|---|---|
| | definition specifically includes removal flights transiting through Qatar and subsequent transfer to Iranian custody. |
| eTD System | The Electronic Travel Document System, used by ICE Enforcement and Removal Operations (ERO) personnel to efficiently request and process travel documents from foreign consular officials for aliens who have been ordered removed or granted voluntary departure but do not possess valid travel documents. |
| Diplomatic Assurances | Any formal or informal communication, memoranda, policy guidance, or agreement documenting guarantees received from the Government of Iran or any transit country (e.g., Qatar) assuring that the removed Iranian National would not face torture, persecution, or severe human rights violations upon arrival or subsequent custody transfer, in compliance with the U.S. obligations under the Convention Against Torture (CAT). |

## III.    Records Requested

### A.  Operational, Logistical, and Financial

The IALDF requests the following categories of records (the categories below target quantitative data, financial records, and logistical infrastructure related to the removal of Iranian Nationals):

**Category 1.    Comprehensive Operational Data Sets (Required in Electronic Format)**

The agency is requested to produce all electronic data sets or spreadsheets, in a readily reproducible electronic form or format, containing the following fields for every Iranian National removed or processed for removal (including attempted removals or individuals on manifests who were ultimately "Not on Board") via air transportation during the specified timeframe.

Required Data Fields:

1. Unique Identifier (Required Substitution): A non-exempt, neutral unique identification number (Unique ID) assigned for this FOIA request, replacing the individual's Alien Registration Number (A-Number), as mandated by precedent detailed in Section V.B. below.

2. Date and Time of Removal or Transfer.

3. Final Charge of Removability (e.g., INA § 212(a)(6)(A)(i)).

4. ERO Field Office Jurisdiction (e.g., Newark, Harlingen).

5. Detention Facility (Final Departure/Transfer Point in U.S.).

6. Flight Log/Tail Number (for ICE Air, commercial charter, military, or other aircraft).

3

7. Aircraft Type (e.g., Boeing 737, Military C-17).

8. Ultimate Destination Country (Iran).

9. All Intermediate Stopover/Layover Transfer Locations (e.g., Doha, Qatar).

10. Status of Asylum/CAT/WOR Claim at time of removal (e.g., pending, denied, protected).

**Category 2.    Flight Manifests and Passenger Name Records (PNR) Data**

The records must allow for tracking individuals throughout the entire removal process, especially non-direct flights involving layovers.

All passenger manifests, flight logs, or other internal agency records detailing the individuals transported on any "Deportation Flight" or "Removal Operation" involving Iranian Nationals. These records must redact all personally identifiable information (PII) other than the requested Unique ID.

The search must explicitly include records documenting the transfer of custody during a "Layover Transfer," which necessitates communication between ERO and external authorities or carriers at the transit location (Qatar). Furthermore, responsive records include specific PNR data (Passenger Name Record) or similar reservation/travel data collected by DHS/CBP.

**Category 3.    Contracts, Costs, and Financial Data**

All documents, including contracts, Memoranda of Understanding (MOU), or Task Orders, related to the use of air transportation services (ICE Air component carriers, subcontracted carriers such as Avelo Airlines, Eastern, or foreign airline carriers like Qatar Air charter) specifically for the "Removal Operation" of Iranian Nationals.

This includes, but is not limited to:

1. Records detailing the specific financial costs (total and per-person) of the removal and transfer utilizing the "Layover Transfer" methodology.

2. Any contracts or MOUs governing the use of U.S. military aircraft for these removals, as military planes have been previously utilized in immigration enforcement operations.

3. Records related to any payment, compensation, or services provided to the Government of Qatar or any Qatari entity in relation to facilitating the "Layover Transfer" of Iranian Nationals.

Table 1 provides a structured overview of the high-value records sought and their anticipated custodial location within the agency, ensuring that the agency coordinates a comprehensive, cross-component search.

Table 1: Targeted Operational Records and Location

4

| Requested Record Category | Specific Document Type / Data Field | Anticipated Primary ICE Component Location | Legal Necessity / FOIA Categorization |
|---|---|---|---|
| Flight Data Sets (Cat 1) | Unique ID (substituting A-Number), Removal Date, Intermediate Stopover Points | ERO Headquarters (ERO Air), ICE Data Systems | Transparency in Volume/Trends, Segregability Mandate |
| Operational Contracts (Cat 3) | ICE Air Task Orders, Subcontracted Charter MOUs, Foreign Carrier Agreements | ICE Office of Acquisition Management, ERO Air | Public Interest in Government Spending & Operational Structure |
| CAT/WOR Vetting (Cat 5) | Internal Policy Directives, Risk Screening Forms | OPLA, ERO Field Offices (Legal Units) | Compliance with Non-Refoulement Obligations (CAT/WOR) |
| Diplomatic Assurances (Cat 6) | Cables, Repatriation Agreements, Acceptance Letters (Iran/Qatar) | OPLA, DHS Office of International Affairs | Determining government integrity/risk assessment prior to removal |

### B.  Legal, Policy, and Diplomatic

These categories target the internal legal and policy deliberations that underpin the operational decisions.

**Category 4.    Internal Operational Policy and Guidance**

All internal policies, directives, memoranda, training materials, or Standard Operating Procedures (SOPs) issued by ICE ERO, ICE Air, or OPLA concerning:

1.  Removal Operations to Recalcitrant Countries: Guidance concerning removal operations to countries, such as Iran, where the U.S. lacks direct diplomatic relations, where travel document procurement is difficult, or where diplomatic acceptance of removals is deemed strained.

2.  Layover Transfer Policy: The official ICE/ERO policy, guidelines, or implementation guidance authorizing and governing the use of the "Layover Transfer" methodology, specifically where custody is transferred to a third country's officials or a foreign charter carrier for final removal to the destination country.

5

3.   Electronic Travel Document (eTD) System: Policies regarding the use of the eTD System, including internal guidance on when travel document requests are flagged, processed, or expedited for Iranian Nationals, particularly in cases where the request is denied by the foreign government.

**Category 5.   Legal Vetting and Protection Screening Records**

All records documenting ICE/ERO or OPLA compliance with non-refoulement obligations under the Convention Against Torture (CAT) and Withholding of Removal (WOR) (8 U.S.C. § 1231(b)(3)) concerning Iranian Nationals:

1.   Screening Procedures: All policy or guidance documents regarding the screening or vetting process applied to Iranian Nationals prior to removal to determine their fear of persecution or torture, including how denials of asylum or CAT/WOR claims influence the final removal procedures. This includes policies addressing the confidentiality of asylum claims and the limited circumstances under which asylum information may be disclosed.

2.   Internal Legal Assessment: Internal communications, email chains, policy memoranda, or decision documents among ICE/OPLA staff discussing the application of CAT/WOR relief or the legal risks associated with removing specific Iranian Nationals known to be vulnerable populations, such as political dissidents, Christian or other religion converts, and gender-based minorities. All policy or guidance documents regarding the screening or vetting process applied to Iranian Nationals prior to removal to determine their fear of persecution or torture.

**Category 6.   Foreign Government Coordination and Diplomatic Assurances**

All communications and documents detailing coordination with foreign governments necessary for the removal of Iranian Nationals:

1.   Diplomatic Assurances: Records documenting the solicitation, receipt, and subsequent efforts by ICE/DHS to follow up on "Diplomatic Assurances" from the Government of Islamic Republic of Iran or any other intermediary or relevant third party government such as the Government of Qatar regarding the treatment of removed individuals upon their arrival or subsequent custody transfer, as required under CAT regulations.

2.   Repatriation Agreements/Acceptance Letters: All formal or informal communications (including cables, "acceptance letters," or other memoranda) between ICE/DHS and the Government of Islamic Republic of Iran (or its diplomatic representative via a third party) or any other intermediary or relevant third party government such as the Government of Qatar, confirming acceptance of Iranian Nationals for removal.

3.   Department of State Coordination: Communications (emails, cables, memoranda) between ICE/DHS and the U.S. Department of State (DOS) concerning the procurement of travel documents for Iranian Nationals, the risk assessment of removal to Iran, or coordination regarding the specifics of the "Layover Transfers" through third countries including Qatar.

6

IV.    <u>Fee Waiver and Expedited Processing</u>

As a non-commercial and charitable nonprofit entity, the Iranian American Legal Defense Fund (IALDF) requests both a fee waiver of all searches, reviews, and duplication fees, and expedited processing.

### A. Request for Fee Waiver (5 U.S.C. § 552(a)(4)(A) and 6 C.F.R. § 5.11(k))

The Requester asserts that disclosure of the requested information is in the public interest because it is highly likely to contribute significantly to public understanding of the operations and activities of the Government and is not primarily in the commercial interest of the Requester.

**Public Interest and Government Activities:**  The records concern highly sensitive, non-routine actions by the Federal Government—the execution of removals to Islamic Republic of Iran, a country with severe human rights concerns and strained diplomatic ties with the US, utilizing complex "Layover Transfer" logistics through third countries (including Qatar). The records will reveal the policy framework, costs, and legality of these operations, enabling the public to assess whether ICE is adhering to non-refoulement obligations under U.S. and international law specially CAT and WOR.

**Significant Contribution to Public Understanding:** Disclosure of operational data, flight manifests, and legal vetting protocols will allow the public and the Iranian American community to assess the integrity, cost, and legality of these specialized removals. This transparency is necessary to confirm or refute allegations of government misconduct regarding due process and human rights violations, fulfilling the core purpose of FOIA. The documentation will allow for external verification of non-refoulement compliance, which has been reported as deficient, thereby contributing significantly to a nuanced public understanding of these specific removal activities.

**Non-Commercial Interest:** The IALDF is a non-commercial, non-profit organization. Any information disclosed as a result of this FOIA request will be made available to the public at no cost, fulfilling the legislative intent of Congress to liberally grant waivers for non-commercial requesters seeking information about government activities.

### B. Request for Expedited Processing (5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e))

The requested records meet the standard for expedited processing due to a "compelling need" that directly concerns threats to life and urgency to inform the public about current government activity.

**Imminent Threat to Life or Physical Safety:** External monitoring indicates that the Iranian Nationals targeted for these removals often include vulnerable populations who may face torture or persecution upon return, such as political dissidents, Christian and other religion converts, sexual and gender minorities, and asylum seekers who had been either denied or prevented from seeking protection. The failure to obtain immediate records regarding internal vetting protocols and diplomatic assurances could reasonably be expected to pose an imminent threat to the life or physical safety of future or currently detained Iranian Nationals facing imminent removal.

7

Immediate judicial review of ICE's compliance with CAT obligations rests on the swift disclosure of these records.

**Urgency to Inform the Public:** There is an ongoing urgency to inform the public concerning actual or alleged Federal Government activity involving human rights and the execution of potentially unlawful removals. The reports concerning the removal flight via Qatar and the existence of a broader agreement to deport over 400 Iranian Nationals to the Islamic Republic of Iran constitute a matter of widespread public interest concerning possible questions about the government's integrity. The disclosure of these documents is urgently needed to inform the public and legislative bodies about the nature and legality of this specialized diplomatic arrangement and operational procedure.

## V.    Requirements for Production, Segregability, and Exemption Mitigation

The agency must adhere strictly to the FOIA mandates regarding the production of records and provide explicit justification for any withheld information.

### A.  Production Format and Segregability

All responsive records must be produced in their native electronic form or format, provided they are "readily reproducible by the agency in that form or format," pursuant to 5 U.S.C. § 552(a)(3)(B).

ICE must adhere to the fundamental statutory mandate of segregability: any reasonably segregable, non-exempt information must be released. For any records withheld or redacted, ICE must identify the location of deletions and the specific exemption cited, showing the deletion at the place on the record where it was made, where technologically feasible.

### B.  Mitigation of Privacy Claims (Exemptions 6 and 7(C))

ICE is expected to invoke Exemption 6 (Personnel, medical, or similar files, clearly unwarranted invasion of personal privacy) and Exemption 7(C) (Law enforcement privacy) to protect personal identifiers, such as the Alien Registration Numbers (A-Numbers), of removed individuals. While the privacy interests of the individuals are acknowledged and protected, the operational and statistical data must be disclosed.

**Unique IDs:**

Pursuant to the precedent established by the Second Circuit in ACLU Immigrants' Rights Project v. ICE, the agency is legally obligated to substitute exempt records (A-Numbers) with non-exempt, neutral "Unique Identifying Numbers" (Unique IDs) in order to afford the public access to non-exempt operational data in the same person-centric manner as the agency uses internally. The agency cannot utilize an exempt record (A-Number) as the sole "key" to access non-exempt data within its computer systems and then invoke the record's exempt status to deny the public similar access. Disclosure of the requested operational data (Category 1) via Unique IDs enables meaningful tracking and analysis of government activities without constituting a clearly

8

unwarranted invasion of privacy. When conducting the required balancing test under Exemption 6 or 7(C), the strong public interest in understanding potential agency misconduct—such as the unlawful removal of asylum seekers—must outweigh the marginal privacy interest in a unique identifier when names and other PII have already been redacted.

### C.  Mitigation of Law Enforcement Procedure Claims (Exemption 7(E))

ICE often attempts to invoke Exemption 7(E) to shield internal law enforcement techniques and procedures, including details of deportation logistics, claiming disclosure would risk circumvention of the law.

Exemption 7(E) protects disclosure only if it "could reasonably be expected to risk circumvention of the law". However, courts have repeatedly established that this exemption does not apply to techniques or procedures that are already "well known to the public". The specific details of the "Layover Transfer" operation to Islamic Republic of Iran via third countries like Qatar, including the use of specific carriers (e.g., Qatar Air charter) and transit points (Egypt, Doha), have been widely reported and documented by third-party aviation monitors. The operational existence of this specialized removal procedure, having been publicly reported, defeats the claim that its disclosure would reveal a confidential law enforcement technique.

Furthermore, the information sought—such as flight manifests, contracts, and generalized removal policies—represents operational logistics and administrative guidance, not the sensitive law enforcement techniques (e.g., access codes or specialized investigative methods) typically protected by Exemption 7(E). The agency must demonstrate logically, and not merely assertively, how the release of these records might create a risk of circumvention.

## VI.  <u>Conclusion</u>

We look forward to your determination on the request for expedited processing within 10 days, and the release of all responsive, non-exempt records within the statutory timeframe. If you have any questions, please contact me at ali.rahnama@ialdf.org or 202-339-1255.

Sincerely,

Ali Rahnama
Executive Director
Iranian American Legal Defense Fund (IALDF)